[Cite as *In re G.W.*, 2020-Ohio-3355.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| IN RE: G.W. and A.N. | : | APPEAL NOS. C-190388 |
|  |  | C-190390 |
|  | : | TRIAL NO. F18-1051X |
|  | : | *O P I N I O N.* |

Appeal From:  Hamilton County  Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: June 17, 2020

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Jonathan Halvonik*, Assistant Prosecuting Attorney, for Appellant Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, Guardian ad Litem for Appellants G.W. and A.N.,

*Tibbs Law Office, LLC*, and *Sarah E. Michel*, and *Ostrowski Law Firm, L.P.A.*, and *Andrea Ostrowski*, for Appellee Mother,

*Roger W. Kirk*, for Appellee Father.

**Winkler, Judge**.

{¶1}    The Hamilton County Department of Job and Family Services ("HCJFS" or "agency") and the guardian ad litem ("GAL") for appellees' minor children, G.W. and A.N., appeal the judgment of the Hamilton County Juvenile Court dismissing a complaint for temporary custody.  The agency had sought custody on the grounds that G.W. and A.N., who had multiple, internal physical injuries, were abused, neglected and dependent.  At the hearing on the agency's motion, medical experts disagreed as to whether the children's injuries were due to a medical condition or physical abuse.  The evidence also showed that appellees had repeatedly taken the young children to medical appointments, at which no abuse was suspected.  The juvenile court carefully weighed the evidence presented at the hearing, determined that the agency had failed to prove its case by clear-and-convincing evidence, and dismissed the complaint.

{¶2}    On appeal, the appellants argue the decision must be reversed because the juvenile court failed to have the appellees' expert witness sworn, and HCJFS presented competent and credible evidence of the allegations.  For the reasons that follow, we affirm.

### I.  Background Facts and Procedure

{¶3}    This case began after mother took two-month-old A.N. to a pediatric visit in early May 2018.  She raised concerns about the fullness of his fontanelle and his lack of feeding, an issue she had raised at several prior pediatric visits since A.N.'s difficult birth with a forceps assist.  Based on these concerns, A.N. was evaluated at Cincinnati Children's Hospital.  Skeletal survey x-rays and computed tomography ("CAT") scan results showed that A.N. had multiple injuries in various stages of healing.  These included a bleed in the subdural space of the skull, and fractures to his ribs, clavicle, extremities and vertebrae.

Dr. Kathi Makoroff, part of the child-abuse team at Children's Hospital, diagnosed A.N.'s injuries as due to "physical child abuse."

{¶4} The medical team at the hospital then evaluated A.N.'s 15-month-old sibling, G.W. She was found to have multiple healing rib fractures, which Dr. Makoroff also diagnosed as due to physical child abuse.

{¶5} Based on the medical evaluation and the parents' inability to present an accidental explanation for the multiple internal injuries, the agency concluded that the children had been subjected to a continuing pattern of physical abuse, likely by the appellees, the biological parents with whom they lived.

{¶6} In June 2018, the appellees sought an alternative explanation for the injuries from Dr. Michael Holick, specializing in the study of the genetic disorder Ehlers-Danlos Syndrome ("EDS") at the Boston University Medical Center. Dr. Holick diagnosed the children as having EDS and concluded that the children's injures were the result of the underlying disorder.

{¶7} In July 2018, HCJFS filed a complaint for temporary custody and received interim custody. Adjudicatory hearings took place on several dates before a veteran visiting judge of the juvenile court.

{¶8} At the adjudication hearing, HCJFS presented testimony and reports from Dr. Makoroff and Dr. Alan Oestreich, another member of the child-abuse team at Cincinnati's Children's Hospital. Both opined that the children's injuries were the result of physical abuse. Dr. Makoroff, an expert on pediatric child abuse, explained that her opinion of physical abuse was based on the medical records, including the films, the family history she had obtained from mother, the location of the injuries, and an examination of the children. Dr. Makoroff, however, had examined the children for less than ten minutes,

and she had not examined A.N.'s birth records, even though A.N.'s subdural bleed and rib fractures could have been the remnant of his difficult birth.

{¶9}     Dr. Alan Oestreich, an expert in pediatric radiology, explained that his opinion of physical abuse was based largely on the films, which he claimed showed no evidence of any metabolic bone disease existing at the time.   Dr. Oestreich, however, did not examine the children.  And his opinion on determining the age of A.N.'s rib fractures conflicted with Dr. Makoroff's opinion that some of the rib fractures could have dated to birth.   Dr. Oestreich also conceded that multiple radiologists could interpret the same x-ray differently, as illustrated by the fact that he based his findings on a review of a radiology report from another physician with whom he disagreed.

{¶10}   The parents' medical expert, Dr. Michael Holick, the only expert on EDS to testify, disagreed with the opinions of Dr. Makoroff and Dr. Oestreich. He opined, consistent with his report that was admitted into evidence, that their injuries were the result of EDS.

{¶11}   Dr. Holick described the children's condition, EDS Hypermobility Type 3, as a disorder of the collagen elastin matrix in the body, which makes bones "much more prone to fracture" and causes infant blood vessel fragility, particularly in the subdural area outside the brain.  Additionally, he explained that the children's skeletons at the time of the injuries were likely compromised by a vitamin D deficiency, remedied by switching to formula feedings.

{¶12}   Dr. Holick relayed that he had made his diagnosis and opinion after thoroughly examining the children, their mother, maternal grandfather, and great grandmother at the Ehlers-Danlos Clinical Research Program, obtaining a detailed family history, and reviewing all the medical records, including the films.

{¶13} Dr. Holick's testimony, presented by a video link, was unsworn, but HCJFS and the GAL did not object to this defect.

{¶14} Other testimony at the adjudication hearing from the medical experts showed that the parents undisputedly had taken the children for frequent, routine medical examinations since birth. Finally, the agency presented testimony from the in-take caseworker for HCJFS assigned to the children and the Hamilton County sheriff's detective assigned to the criminal investigation involving the children. This testimony demonstrated that the parents had been indicted on charges of child endangering and felonious assault, but they had made no incriminating admissions except that they were the sole caretakers for the children.

{¶15} After the presentation of the evidence, the parties submitted written closing arguments. Subsequently, the juvenile court issued a written decision dismissing the complaint for lack of clear-and-convincing evidence. The court also summarized the evidence and explained why it had found Dr. Holick's testimony more credible.

## II. Arguments on Appeal

{¶16} HCJFS's first two assignments of error claim the juvenile court's failure to have Dr. Holick sworn and its reliance on his testimony was either objected-to or plain error. In its final assignment of error, HCJFS contends the court erred by failing to adjudicate the children abused, neglected, and dependent, when HCJFS had presented clear-and-convincing evidence of the allegations. The GAL raises two assignments of error, both alleging that the court erred by dismissing the complaint and failing to adjudicate the children as abused and dependent based on the evidence presented. According to the GAL, the court clearly lost its way when evaluating the evidence.

### A. Failure to Have Dr. Holick Sworn

{¶17} The record shows that Dr. Holick testified out of order at the start of the second day of the adjudication hearing. Although Dr. Holick was located in Boston, he testified live by a video telelink. After the court resolved technological issues, mother's attorney asked the court, "Are you ready for me to inquire?" The court replied, "Let's do some identifying testimony first."

{¶18} Mother's attorney asked Dr. Holick a series of questions concerning his qualifications. The following exchange then transpired:

[Mother's attorney]: Okay, Dr. Holick, we are going to need to swear you in

here at the court. So I'm going to let – turn that over to the Judge to do.

The Court: I'm sorry?

[Mother's attorney]: Do you want him sworn in?

The Court: No. Will you stipulate to his qualifications?

[HCJFS's attorney]: Yeah. Job and Family Services would stipulate to his

educational background or his curriculum vitae.

The Court: Thank you. And will you stipulate to the expert qualification?

[HCJFS's attorney]: Yeah. And an expert in Ehlers-Danlos Syndrome.

That's what Job and Family Services will stipulate.

The Court: Thank you. I appreciate that. Go ahead [mother's attorney].

{¶19} After this exchange, Dr. Holick's testimony continued without objection. HCJFS and the GAL cross-examined him, and the trial court asked him several questions.

{¶20} HCJFS now contends that the juvenile court's decision must be reversed because the trial court "declined" to swear in Dr. Holick and then relied upon his testimony in making its decision.

{**¶21**}  R.C. 2317.30 provides that "[b]efore testifying, a witness shall be sworn to testify to the truth, the whole truth, and nothing but the truth."  Ordinarily, it is reversible error for a court to refuse to have a witness sworn and then rely upon that witness's unsworn testimony in resolving the dispute.  *State v. Ballou*, 21 Ohio App.2d 59, 254 N.E.2d 697 (1st Dist.1969); *see Arcaro Bros. Builders, Inc. v. Zoning Bd. of Appeals*, 7 Ohio St.2d 32, 218 N.E.2d 179 (1966).  But, the mere failure to have a witness sworn is error that may be waived, and thus, unsworn testimony is competent evidence where the opposing counsel neither requests that the witness be sworn nor makes a timely objection to the testimony.  *See Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Standards and Bldg. Appeals*, 41 Ohio St.2d 41, 322 N.E.2d 629 (1975); *State v. Mason*, 2d Dist. Montgomery No. 8164, 1983 WL 4959 (Sept. 20, 1983).

{**¶22**}  Although the agency characterizes the juvenile court's conduct here as a refusal to have a witness sworn as in *Ballou*, the cases are distinguishable.  *Ballou* involved the reversal of a conviction for operating a motor vehicle while under a license suspension.  *Ballou* at 60.  At trial, the court called the deputy clerk of court as a witness and permitted him to testify to the defendant's prior record without first having been sworn.  *Id.*  Defense counsel objected, but the court overruled the objection, explaining that the witness did not need to be sworn because he was " 'an officer of the court.' "  *Id.*   In this matter, the transcript reveals that the court expressed difficulty hearing the request of appellee mother's attorney to have the witness sworn, and its negative reply to the attorney's question was combined with an inquiry to HCJFS's attorney concerning a stipulation to the witness's qualifications.  Thus, we conclude that the juvenile court misheard mother's attorney's question, and its inapt response, when considered in context, was not an intentional refusal to have the mother's witness sworn, as in *Ballou.*

7

{¶23}  Further, unlike in the appellant in *Ballou*, HCJFS did not request that Dr. Holick be sworn or object to his testimony.  Instead, HCJFS stipulated to his qualifications as an expert, cross-examined him, and cited parts of his testimony in support of an adjudication, thus treating him as fully qualified and competent to testify.   Under these circumstances, we conclude that HCJFS waived any error in the court's failure to have Dr. Holick sworn.

{¶24}  HCJFS also raises a claim of plain error.  Our application of the plain-error doctrine to remedy error that the appellant failed to object to is strictly limited "to the extremely rare" case "involving exceptional circumstances" where the error "seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), syllabus; *In re E.N.*, 1st Dist. Hamilton No. C-170272, 2018-Ohio-3919, ¶ 27; *Matter of J.M.*, 4th Dist. Ross No. 18CA3633, 2018-Ohio-5374, ¶ 28.  For example, we have applied the plain-error doctrine to remedy the court's violation of a mother's due-process rights at a dependency hearing when court failed to satisfy its duty to determine whether mother was making a knowing, intelligent, and voluntary admission to facts that resulted in the permanent loss of her parental rights.  *See In re Etter*, 134 Ohio App.3d 484, 731 N.E.2d 694 (1st Dist.1998).

{¶25}  This case does not meet the plain-error standard.  Importantly, there is nothing in the record to support a conclusion that Dr. Holick's testimony would have been different had it been presented under oath.   HCJFS stipulated to Dr. Holick's qualifications as an expert.  Further, Dr. Holick's testimony was consistent with his report, which was admitted as an exhibit at the adjudication hearing.  He was thoroughly cross-examined at the hearing by HCJFS and the GAL, and the court asked several questions.

Consequently, although the juvenile court failed to have Dr. Holick sworn, HCJFS failed to object to the error, and the record shows that this is not "the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process," *See Goldfuss* at 122-123, requiring a reversal under the plain-error doctrine. Accordingly, we overrule HCJFS's first and second assignments of errors.

## B. Failure to Adjudicate

{¶26} The remaining assignments of error, which can be addressed together, are also not demonstrated by the record. HCJFS and the GAL argue the trial court erred in failing to find the children abused, neglected, and dependent based on the competent and credible evidence adduced at the adjudication hearing.

{¶27} As set forth in the complaint, the agency requested a finding of abuse pursuant to R.C. 2151.031(B), (C), and (D); neglect pursuant to R.C. 2151.03(A)(3) and (6); and dependency pursuant to R.C. 2151.04(B) and (C). The underlying bases for these allegations was the claim that the children were victims of physical abuse, by their parents or others, that the parents failed, either willfully or through neglect, to seek proper medical treatment for their injuries, and that the children lacked adequate care and support. The agency was required to prove the allegations by clear-and-convincing evidence. *See* Juv.R. 29(E)(4). After weighing the evidence presented at the multiple-date hearing, the juvenile court determined that the state did not meet its burden.[1]

{¶28} The record shows the juvenile court applied the correct statutory tests based on the allegations set forth in the complaint. The appellants contend, however, that

---

[1] The juvenile court dismissed the complaint under Juv.R. 29(F)(1) for failure of proof, not under (F)(2)(d), which provides the court with discretion to dismiss the complaint when the allegations are admitted or proven, "if dismissal is in the best interest of the child and the community."

the court failed in weighing the evidence presented. To review a weight-of-the-evidence claim, this court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *See In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12; *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), cited in *McKenna v. McKenna*, 1st Dist. Hamilton No. C-180475, 2019-Ohio-3807, ¶ 10.

{¶29} The burden for appellants to prevail on this claim is substantial. The juvenile court is afforded great deference because it was the fact-finder and the case involves the custody and welfare of children. *See In re A.B.* at ¶ 28. Under these circumstances, "to reverse on the ground that the judgment was against the manifest weight of the evidence, the judgment must be so contrary to the probative value of all the admissible evidence that was before the trial court that we can only conclude that the court lost its way and a manifest miscarriage of justice resulted." *Id.*

### Abuse

{¶30} HCJFS presented Dr. Makoroff's and Dr. Oestreich's opinion testimony to show that the injuries were the result of physical abuse. The parents admitted that they were the sole caretakers of the children, but the evidence contains no other incriminating admissions. Dr. Holick's opinion refuted the agency's evidence that the injuries were inflicted by physical abuse.

{¶31} Appellants' arguments that the juvenile court lost its way when weighing the expert testimony are not persuasive. For instance, appellants argue that Dr. Holick's

diagnosis is not credible because one tool for the EDS diagnosis, the Beighton Scale, is not applied to children under the age of five. This limitation is due to young children's increased flexibility and resistance to certain evaluation tests. But Dr. Holick explained that due to his refined techniques and his 40 years of practice, he is able to determine if a child's flexibility is beyond the normal range for the child's age and gender. Further, he explained that he relied on other indicators beyond the children's extreme joint hypermobility, including the family history of the genetically-acquired disease and physical manifestations such as blue sclera in the children's eyes and the elasticity and transparency of their skin.

{¶32} Appellants argue also that Dr. Holick's opinion was undermined by testimony from the detective indicating that neither child had medical issues after removal from parents' care. But the detective's testimony conflicted with Dr. Makoroff's testimony that A.N. was treated for medical issues in the fall of 2018, when the children were in foster case. Further, the caretakers would have been aware of Dr. Holick's July 2018 diagnosis concerning the children's frailty. Additionally, the children's injuries were unusual in that they would not be diagnosed without films. Finally, Dr. Holick indicated that children's bone structure and frailty would have improved when their vitamin D intake increased.

{¶33} The trial court accurately summarized the testimony at the hearing, and explained that only Dr. Holick had performed an in-depth examination of the children. The trial court also accurately noted that some of Dr. Oestreich's radiology opinions conflicted with Dr. Makoroff's and those of another physician upon whose radiology report he based his own findings. Further, the court noted the lack of evidence showing

11

any "hint of suspicion" of abuse by medical personnel who examined the children during their many medical appointments before May 2018.

{¶34} Ultimately, Dr. Holick was the only expert in EDS who testified. In addition to his expertise in EDS due to 40 years of practice, he is the Director of the Bone Health Clinic and the Vitamin D, Skin and the Bone Research Laboratory at the Boston University Medical Center. Dr. Holick testified with specificity about the frailty of the children in connection with the injuries. For instance, he explained that the children were so frail that the normal burping of the children and A.N.'s difficult birth would have caused the rib fractures, and that the forceps delivery likely caused A.N.'s subdural bleed. He further explained that the possible serious effects of such a bleed are minimized if the child's cranial cavity is large enough, a circumstance he found likely in this case. He unequivocally opined that the children's injuries were the result of their inherited medical condition, EDS.

{¶35} The juvenile court recognized the "impeccable qualifications" of all the experts and acknowledged the difficult task of weighing and balancing the expert testimony, but permissibly afforded Dr. Holick's testimony substantial weight when determining that the agency failed to meet its high burden of proving the children were the victims of abuse by clear-and-convincing evidence. Further, the court exhibited sincere concern for the welfare of the children and due respect for the judicial process. The record does not show that the judgment is "so contrary to the probative value of all the admissible evidence" that this court "can only conclude that the court lost its way and a manifest miscarriage of justice resulted." *In re A.B.*, 1st Dist. Hamilton No. C-150307, 2015-Ohio-3247, at ¶ 28.

*Neglect and Dependency*

{¶36} Similarly, there is nothing in the record to suggest the juvenile court lost its way when dismissing the allegations of neglect or dependency. HCJFS's and the GAL's primary argument is that the children's home environment warranted the state to assume guardianship. This argument, however, is based on the unproven allegation of physical abuse.

{¶37} Further, the agency presented no evidence that the parents had any impediments that prevented them from parenting the children or that the parents had failed to provide appropriate care or support. Dr. Marokoff testified that the pediatric medical records she reviewed showed the parents had taken A.N. to the pediatrician five times before his visit on May 2, 2018, at eight weeks of age, and that the parents had taken G.W. to the pediatrician 15 times since her birth. Dr. Holick presented similar testimony showing the parents' appropriate attention to the children's medical needs. Although the actual pediatric medical records were not admitted into evidence, we cannot say the juvenile court lost its way in relying on this unobjected-to testimony.

{¶38} Consequently, because the appellants' claims are not supported by the record, we overrule the agency's third assignment of error and the GAL's two assignments of error.

### III. Conclusion

{¶39} This court is guided by the presumption that the juvenile court's findings are correct, and must be aware that as in any trial, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The agency's central allegation of physical abuse was refuted by Dr. Holick. In affording great weight to

Dr. Holick's testimony, the juvenile court did not so lose its way as to create a manifest miscarriage of justice warranting a reversal. We also cannot say that the trial court's failure to have Dr. Holick sworn rose to the level of plain error, as there was no demonstration that his testimony would have been different if under oath. Accordingly, we affirm the juvenile court's dismissal of HCJFS's motion for temporary custody.

Judgment affirmed.

**MOCK, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.