[Cite as *Edelstein v. Edelstein*, 2025-Ohio-1514.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| ELIOTT EDELSTEIN, | : | APPEAL NOS. | C-240044 |
| | | | C-240127 |
| Plaintiff-Appellee, | : | TRIAL NO. | DR-2201279 |
| vs. | : | | |
| KIMBERLY EDELSTEIN, | : | | |
| | | *O P I N I O N* | |
| Defendant-Appellant. | : | | |

Appeals From: Hamilton County Court of Common Pleas, Domestic Relations
Division

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 30, 2025

*Eliott Edelstein*, pro se,

*Kimberly Edelstein*, pro se.

**MOORE, Judge.**

**{¶1}** Defendant-appellant Kimberly Edelstein ("Mother") appeals the judgment of the Hamilton County Court of Common Pleas, Domestic Relations Division, in the case numbered DR-2201279, entering a final divorce decree and awarding custody of the parties' child to plaintiff-appellee Eliott Edelstein ("Father").

**{¶2}** Mother raises nine assignments of error, which challenge the court's jurisdiction, the procedures followed by the court at trial, the court's division of marital assets, and the court's custodial award. As explained below, we affirm the trial court's judgment in part, reverse it in part, and remand the cause to the domestic relations court to correct its division-of-marital-assets entry.

## I.   Factual and Procedural History

### A.  Parties' Separation and Divorce Proceeding

**{¶3}** It's been said that "All happy families are alike; each unhappy family is unhappy in its own way." This is one of those unique situations.

**{¶4}** Mother and Father married in 2002. Together, they raised three children, two now-adult children and S.E. who was born in March 2012. Mother, Father, and S.E. lived together in a house located in Blue Ash, Ohio, until April 2022, when ongoing marital problems caused the couple to separate, with Father moving out of the Blue Ash home. Following the separation, the relationship between the parties continued to deteriorate. Father eventually filed for a "Domestic Violence Civil Protection Order" ("DVCPO") against Mother, which was granted in July 2022.

**{¶5}** In August 2022, Father filed for divorce in Hamilton County, Ohio. Father initially stated in his motion for temporary parenting orders that he had no objection to Mother being the residential custodian. But, Father's divorce complaint and September 6 motion for temporary parenting orders requested that he serve as

the sole legal and residential custodian. Father's subsequent motion for a temporary parenting order alleged that Mother had moved S.E. out of state without informing any family members. Father also expressed concerns with Mother's mental health.

**{¶6}** Father attached to his divorce complaint the Child Support Enforcement Agency calculation that set Mother's monthly child-support contribution at $572.68 and Father's at $437.34.

**{¶7}** In response to Father's complaint, Mother filed a motion to dismiss based on improper venue. The court denied the motion.

**{¶8}** Except for a brief period when he sought shelter with a friend in Dayton, Ohio, because he had no place else to live, Father continued to reside in Cincinnati throughout the duration of this action. Mother and S.E. moved several times following the separation and after moving out of the Blue Ash home. At one point, Mother and S.E. briefly stayed in Wyandot County, Ohio; then moved to somewhere along the east coast; and, ultimately settled in Indianapolis, Indiana.

**{¶9}** On October 31, 2022, the court appointed a guardian ad litem ("GAL") for S.E. But, in March 2023, both Mother and the GAL separately asked the court to withdraw the appointment of the GAL. Mother asked that the GAL be removed for cause. Specifically, Mother claimed that the GAL's performance was deficient, claiming that she acted with bias, she inappropriately interviewed S.E.'s siblings, and her report focused on irrelevant concerns. In her motion, the GAL cited as her basis that there was a "clear lack of reasonable communication" with one of the parents. On March 31, the court denied Mother's motion and granted the GAL's motion. That same day, Mother filed a notice of appearance on behalf of S.E. In its June 28, 2023 entry, the court explained that S.E. did not need legal representation at that point in the case. The court also held that Mother was disqualified from serving as S.E.'s self-appointed

3

attorney. The court concluded that if either party believed that S.E. needed representation, he or she could file a motion with the court asking that a GAL be appointed again. Neither party did so.

{¶10} On June 2, 2023, the court entered a visitation order. The order established that S.E. would visit Father every other weekend. The order further specified that the parents would exchange S.E. at a designated location on Friday at 5:30 p.m. and Sunday at 4:00 p.m. The visitation order specifically took into consideration Mother's religious restrictions and set the visitation schedule so as not to force Mother to break Sabbath.

{¶11} Despite the directives contained in the court's visitation order, between June 10 and December 12, 2023, Father filed ten motions asking that the court hold Mother in contempt. Father alleged that Mother repeatedly ignored the court's order and refused to let him visit S.E. In her response, Mother claimed that the visitation order violated her First Amendment right to free exercise of religion by forcing her to violate the Sabbath.

### B. The Trial

{¶12} On November 16 and 17, the court held a final hearing on Father's contempt motions along with the other matters that remained at issue in the case. The two central issues at the hearing included a determination of what custodial arrangement would be in S.E.'s best interest and the division of the marital assets.

{¶13} With respect to custody and visitation, Father and Mother both called multiple witnesses. Father testified on his own behalf and called Kimberly Kent, the social worker who had completed a parental-visitation evaluation. Father also called the parties' two adult children. In addition to testifying on her own behalf, Mother

4

called as witnesses two family friends, her parents, her rabbi, and the private investigator she had hired, Pierce Bryant.

{¶14} The court used two different procedures to swear in the witnesses before they testified. In some instances, the witnesses were sworn in by raising their right hands and giving an affirmation on the record. In others, the witnesses were individually sworn in by the judge's staff attorney outside of the courtroom. These witnesses were then escorted into the courtroom to give their testimony. After the staff attorney brought each witness to the stand, the staff attorney would announce on the record to the parties and the judge that the witness was under oath. Mother did ask if the witnesses had been properly sworn, but she did not object to the court's procedure prior to any of the witnesses testifying. Instead, Mother waited to raise her concerns in a posttrial proffer.

{¶15} Kent, the social worker, testified regarding the steps she took in compiling her custody-evaluation report. Kent explained that she scheduled a joint Zoom interview with Mother and Father to better understand their relationship. Kent recalled that Mother was concerned with the privacy of the call and left the call after roughly 15 minutes. Kent testified that she continued to interview Father after Mother left. Kent explained that that she was also able to interview S.E. and his adult sister.

{¶16} Kent's report concluded that the visitation schedule should be amended to provide Father with more visitation. Kent testified that she feared Mother had subjected S.E. to "coercive control," a form of emotional abuse. Kent based her conclusion on S.E.'s estranged relationship with both Father and his adult siblings. Kent also relied on reports that S.E. was underperforming in school.

{¶17} During his testimony, Father also raised concerns about Mother's control over S.E. Father claimed that he was "kicked out" of the marital home and

5

went months without being able to see S.E. He also claimed that he had no idea Mother and S.E. had moved out of state. Father played voicemails and recordings of S.E. shortly after the parties had separated, where S.E. was stating that he loved and missed his father. Father testified, however, that as time passed after he and Mother separated, his relationship with S.E. deteriorated, and he feared Mother was intentionally trying to alienate S.E. from him. In support of this claim, Father played recordings of S.E. screaming at him and giving specific details about the parties' divorce, including asking Father "when will you give Mom the Get[1] so I can have another dad who will be better than you?" Father also testified that Mother threatened to never let him see S.E. again. Father explained to the court that if he could visit S.E., he would be content with whatever custody arrangement the court adopted.

**{¶18}** Bryant, the private investigator, testified that Mother hired him to investigate Father's alleged adultery and drug use. After surveilling Father for a day, Bryant found no evidence to support either claim.

**{¶19}** During her testimony, Mother claimed that moving to Indianapolis was in S.E.'s best interest because it allowed her and S.E. to move away from Father, restart their lives, and dedicate themselves to their faith. She claimed that Father was an abusive partner and that it was his decision to leave the marital home and abandon the family. Mother also claimed that Father was both an adulterer and a drug addict; however, no evidence emerged during the trial to support these two claims.

**{¶20}** Mother denied Father's claim that she had tried to alienate S.E. from him. While maintaining that she could not comply with the court's visitation order, because of both her faith and a claimed physical disability, Mother asserted that she

---

[1] A "Get" is a Jewish divorce document.

still wanted Father to be part of S.E.'s life. When asked to offer an alternative visitation plan, Mother suggested that Father drive to Indianapolis for each visit. She added that Father could stay in a Sabbath-observant Jewish community home, which would allow he and S.E. to worship together.

{¶21} As to the division of marital property, the testimony came from the parties themselves. Both parties agreed that they had purchased and jointly held two vehicles, a 2018 Nissan Rogue driven by Mother and a 2019 Nissan Sentra driven by Father. Father testified that the Sentra had an outstanding loan balance of roughly $4,000.

{¶22} In terms of additional assets, Mother testified that she maintained a $14,000 life-insurance policy, and that she had closed out her retirement account from her former job and had withdrawn $46,000 to mitigate the financial hardship caused by the couple's separation. Father testified that he continued to maintain his employer-sponsored retirement account, which had a balance of $15,202. Father explained that, following the divorce, he cashed out his life-insurance policy and used the $11,664 he received to cover his daily living expenses.

{¶23} Both parties testified that they had debts. Mother explained that she was the principal borrower on the loan for the Sentra, and that she had both student-loan debt and $7,000 she owed on a credit card. Mother claimed that much of the credit-card debt was what remained as the result of Father's credit-card debt being transferred to her card while the parties were together in 2022.

{¶24} Father claimed that Mother denied him the opportunity to retrieve his personal items from the marital home. Father testified he had left behind familial memorabilia, religious heirlooms, and other personal items when he had moved out. Father explained that while he was given a brief opportunity to collect a few of his

personal items from the home, Mother never gave him a sufficient opportunity to meaningfully collect his belongings. Mother told Father that she put the items he had left behind in storage and that he would be able to retrieve them the next time she was in Ohio.

{¶25} Despite communicating to Father that his possessions were in storage and that he would be able to retrieve them, Mother testified that after she had determined that storage was too much of an inconvenience, she called a trash service and had Father's personal property destroyed. Mother admitted that she did not notify Father prior to having his belongings destroyed.

{¶26} In 2017, Mother filed two claims against her former employer in federal court, alleging employment discrimination and a violation of her First Amendment rights. In February 2023, a jury returned a verdict in Mother's favor on her First Amendment claim, and awarded her $835,000 in backpay, $250,000 in compensatory damages, and $35,000 in punitive damages, for a total award of $1,120,000.

{¶27} During the trial underlying this appeal, the parties disputed their respective claims to the proceeds from Mother's federal lawsuit. Father asserted that the award should be included as part of the marital assets while Mother claimed it should not be. Mother asserted that her jury award should not be included in the division of marital assets because the award was not for backpay, which she claimed would not be appropriate for a First Amendment claim. Mother also argued that, as a matter of equity, Father should not share in the proceeds since the verdict was returned after the parties had separated.

### C. The Court's Findings

{¶28} In the weeks following trial, the court entered judgments on the parties' multiple motions for contempt. The court found that the only meritorious motions involved Father's claims regarding Mother's violation of the visitation order. The court entered eight findings of contempt against Mother and sentenced her to 90 days in the Hamilton County Justice Center and required her to pay Father $1,000.

{¶29} On December 21, 2023, the court held a hearing to announce its custodial decision. After conducting an in-camera interview with S.E. earlier that day, the court found that Mother had subjected S.E. to "resist refusal behavior," which the court held constituted emotional abuse. The court found that S.E. "has been indoctrinated and has adopted [Mother's] view entirely," and that S.E. would need intensive therapy and separation from Mother to be rehabilitated. At the hearing, the court awarded Father sole custody of S.E. In its entry awarding custody, the court specifically addressed each factor within R.C. 3109.04(F)(1)(a) through (j), which provides the statutory guidelines courts are to consider when making custodial determinations. These factors include but are not limited to the wishes of the child, the child's interrelationship with those that would significantly impact the child's best interest, the mental and physical health of all persons involved, and the likelihood that the parents would the comply with the court's orders. In its findings, the court expressed concern that Mother was emotionally abusing S.E., as demonstrated by Mother's efforts to sever S.E.'s bonds with his father and his siblings.

{¶30} On the issue of visitation, the court temporarily suspended Mother's visitation and contact rights, to allow Father and S.E. to repair their relationship. Like the court's custody determination, the court also specifically addressed each statutory consideration within R.C. 3109.04(F)(2)(a) through (e), the statutory guidelines courts consider when making visitation determinations for parents. These

considerations include but are not limited to the parents' ability to cooperate and encourage the child to have a relationship with the other parent, as well as any history of child abuse. The court concluded that the parties failed to demonstrate an ability to jointly act in S.E.'s best interest and that Mother has no ability to encourage a relationship between S.E. and Father. The court also found that there was violence within the parties' marital home. In reaching this conclusion, the court considered the testimony of the parties' adult children that Mother was a harsh disciplinarian and the testimony from the parties that they would at times get physically violent with each other. The court concluded that a hearing would be held on January 24, 2024, to determine when daily digital contact between Mother and S.E. would start.

{¶31} Soon thereafter, the court entered its judgment issuing a child-support order and parsing the parties' marital estate. The court ordered Mother to pay Father $607.65 per month in child support. As to the division of vehicles, the court found that only Father's vehicle was jointly held, despite both parties' testimony and exhibits evidencing that both vehicles were jointly held. While the court directed that both parties were to take their respective vehicles free and clear from any claim of the other party, the court only ordered Mother to relinquish her interest in Father's vehicle. The court held that the parties were to retain debts, financial accounts, and life-insurance policy plans free and clear from claims from the other party. As to retirement plans, the court ordered Mother to pay Father $23,000, which was half of the proceeds from her retirement account. Father was allowed to keep his retirement plan in full, as an offset for the debt he had to assume. The court also held that because of Mother's destruction of Father's personal effects, she was to pay him $5,000. Finally, as to potential proceeds from Mother's lawsuit, the court took judicial notice of the jury's

verdict, which expressly stated that Mother was entitled to a backpay award and concluded that Father would be entitled to half of that award.

### D. *Appellate Procedural History and Post-Judgment Motions*

**{¶32}** On January 3, 2024, Mother filed her first notice of appeal. But Mother's notice was premature because it attempted to appeal the court's predecree order on custody and parenting rights. In our January 17 entry, we dismissed Mother's first appeal for lack of jurisdiction, holding Mother's appeal was not taken from a final appealable order. On January 18, the trial court attempted to enter a decree of divorce, however, Mother again filed a premature notice of appeal, which predated the court's entry. Considering Mother's second notice of appeal, the court struck its decree of divorce and stated that it was divested of jurisdiction to hold the January 24, 2024 hearing to re-establish Mother's visitation rights. In our January 31 entry addressing the second notice of appeal, we remanded the matter to the trial court to enter a divorce decree and rule on pending motions. Later that day, the court entered its final judgment, granting the divorce. The court did not reschedule the hearing on Mother's visitation rights. On February 28, 2024, Mother filed her third notice of appeal following the court's entry of the final divorce decree.

**{¶33}** During the pendency of Mother's appeal, she filed numerous motions that have impeded this court's review. Mother filed three affidavits for disqualification of the trial court judge as well as numerous emergency motions. Father also filed for an emergency protective order restricting Mother's access to S.E.'s records. Father's motion alleged that Mother has continued to disregard the court's order limiting Mother's contact and visitation with S.E. On May 8, the trial court granted Father's motion. The court considered the best-interest factors set forth in R.C. 3109.04(F)(1) as well as R.C. 3109.051(H)(1) and concluded that Mother's behavior has given the

court "grave concerns about [S.E.'s] emotional safety and mental stability." The court concluded that Mother shall not have access to any of S.E.'s records until further notice.

{¶34} On July 5, Mother filed an "Emergency Motion to Correct the Record." In her motion, Mother requested the trial court correct the transcript and declare that the sworn witnesses were not actually sworn. The trial court addressed Mother's challenge in its July 27 entry where it explained why its oath-administration process complied with the Ohio Revised Code as well as the Ohio evidentiary rules. The court stated that since the administration of oaths is a ministerial duty, the court could delegate this obligation to its staff attorney, since the staff attorney was an officer of the court. Accordingly, the court denied Mother's motion.

## II.  *Analysis*

{¶35} On appeal, Mother raises nine assignments of error. Mother asserts that the court erred in (1) awarding Father sole custody of S.E.; (2) failing to strike Kent's custody-evaluation report; (3) failing to swear in six testifying witnesses on the record; (4) finding venue proper; (5) erroneously taking judicial notice of her federal lawsuit's jury award; (6) dividing the marital assets; (7) asserting jurisdiction to implement a new child-support order; (8) finding her in contempt of court; and (9) finding that its restriction of Mother's contact with S.E. and access to his records were in S.E.'s best interest. We consider these arguments in turn.

### A. Custodial Award

**{¶36}** In her first assignment of error, Mother identifies general and specific errors in the court's best-interest analysis, arguing that the court should not have restricted her visitation rights and that the court erred when it awarded Father sole custody of S.E.

**{¶37}** We review allocations of parental rights and responsibilities for an abuse of discretion. *Brew v. Brew*, 2023-Ohio-1457, ¶ 25 (1st Dist.). An abuse of discretion exists where the domestic relations court's determination is not supported by competent, credible evidence. *Id.* We afford great deference to the conclusions of the trial court in custody matters given the court's knowledge gained through observing the witnesses, which cannot be adequately conveyed through a written record. *Id.*

**{¶38}** When making parental-rights determinations, the trial court must consider all relevant factors when determining what is in the best interest of the child. R.C. 3109.04(B)(1). Best-interest determinations are guided by "all relevant factors, including but not limited to" the ten enumerated factors within R.C. 3109.04(F)(1). *Ijakoli v. Alungbe*, 2024-Ohio-5287, ¶ 48 (1st Dist.). These factors include

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) . . . whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1)(a)-(j).

{¶39} Similarly, when making determinations regarding parental visitation rights, R.C. 3109.04(F)(2)(a) through (e) provides a list of statutory factors a court must consider. These factors include:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

R.C. 3109.04(F)(2)(a)-(e).

{¶40} Mother's argument generally alleges that the trial court created a custodial dispute where none existed. But Mother's argument ignores the fact that Father's divorce complaint requested that he be the residential and legal custodian of S.E. Thus, based on Father's divorce complaint and his September 2022 motion for temporary-parenting orders, a custodial dispute did exist, and therefore Mother's general argument fails.

{¶41} Similarly, Mother's specific arguments also fail. The court heard ample testimony from several witnesses to support its findings. This included testimony from S.E., Mother, and Father, S.E.'s siblings and grandparents, friends of the parties, Mother's private investigator, and a rabbi familiar with the family. The court also heard testimony from the social worker who had compiled a custodial report after speaking with Mother, Father, and one of S.E.'s siblings.

{¶42} The custodial report was one of several exhibits considered by the court in addition to witness testimony. The custodial report concluded that Mother was exerting coercive control over S.E., which was causing S.E.'s alienation from the rest of his immediate family. Other exhibits included recordings of conversations between S.E. and Father, in which S.E. increasingly sounded less interested in seeing Father, with S.E. asking Father about intimate details of the parties' divorce and wondering when Mother could replace Father.

{¶43} Based on the evidence introduced at trial, the court's R.C.

15

3109.04(F)(1)(a)-(j) findings were supported by the record. As to the R.C. 3109.04(F)(1)(a)-(j) factors, the court adequately considered the custodial wishes of both parents and conducted an in-camera interview with S.E. The court determined that Mother removed S.E. from the state without giving notice to Father. The court found that this act severed S.E.'s ties to the Cincinnati community and diminished his relationship with Father and his siblings. The court assessed the health of all parties involved, noted that the parties were violent towards one another when they were together, and concluded that Mother's repeated claims that Father was a drug addict were unsubstantiated.

{¶44} Further, the court did not err in interviewing S.E. The court, after interviewing S.E., concluded at the December 21, 2023 hearing that the court's fears had come true—S.E. had become "indoctrinated." Mother insists that the court erred when it failed to adequately consider the wishes of S.E., arguing that the court's interview was conducted for an illegitimate purpose and that the transcript of the interview should be unsealed.

{¶45} Pursuant to R.C. 3109.04(B)(2), the court has the discretion to interview a child subject to a custodial-allocation dispute. We have recognized that the contents of an in-camera interview with a child are confidential. *Hammon v. Hammond*, 2019-Ohio-1219, ¶ 13 (1st Dist.) *See In re T.B.-G*, 2018-Ohio-4116, ¶ 4 (8th Dist.) (holding that "parties are not normally entitled to review a transcript of the in-camera interview"); *Lawson v. Lawson*, 2013-Ohio-4687, ¶ 57 (5th Dist.) ("[Parent] does not have the right of access to the sealed transcript of the in-camera interview between the children and the trial court."); *Chapman* v. *Chapman*, 2007-Ohio-2968, ¶ 27 (2d Dist.) (concluding that allowing parents access to the in-camera interview transcript would defeat R.C. 3109.04(B)(2)(c)'s purposes of eliciting a child's candid desire while

16

also insulating them from potential parental hostility). Thus, the trial court did not err when it did not unseal S.E.'s in-camera interview.

{¶46} The court's R.C. 3109.04(F)(2)(a)-(e) findings are also supported by the record. The record demonstrates that Mother lacks the ability to foster a meaningful relationship between S.E. and Father, given Mother's multiple failures to comply with the court's visitation order and the recorded conversations between S.E. and Father. Additionally, the court's determination that Mother was a harsh physical disciplinarian was supported by testimony from both of S.E.'s siblings. Further, the court properly concluded that no GAL recommendation was made. While Mother takes issue with the court's decision not to give a more in-depth recitation of facts that would explain the absence of a recommendation, Mother does not dispute that no GAL recommendation existed for the court to consider.

{¶47} Based on the evidence before it, we cannot say that the trial court abused its discretion in awarding Father sole custody. And, based upon the extensive record before this court, including the trial court's detailed findings supporting its custody determination, neither Mother's specific nor general arguments demonstrate that the trial court acted unreasonably, arbitrarily, or unconscionably. Therefore, Mother's first assignment of error is overruled.

### B. Custodial-Evaluation Report

{¶48} In her second assignment of error, Mother insists the court erred when it failed to grant her motion to strike the custody-evaluation report. Mother takes issue with several claimed deficiencies by the social worker. These included the social worker's alleged lack of neutrality, omission of material facts from the report, failure to investigate, inclusion of unsubstantiated concerns, and her creation of a false record that prejudiced Mother.

**{¶49}** A trial court maintains broad discretion as to the admission and exclusion of evidence, and we review challenges to a court's admission of evidence for both an abuse of discretion and proof of material prejudice. *Gauthier v. Gauthier*, 2022-Ohio-541, ¶ 24 (1st Dist.).

**{¶50}** The court's decision not to strike Kent's report was not an abuse of discretion. While Mother takes issue with the content of the report, many of the alleged issues are topics that could have been readily addressed had Mother participated in the interview process. Because Mother refused to participate, the social worker was left to rely on her interviews with Father and S.E.'s adult sibling who did participate. Had she chosen to participate in the interview, Mother would have had the opportunity to dispel the claim that she was exerting coercive control over S.E. By participating in the interview, Mother could have also explained her claim that Father was domestically abusive, or detailed how S.E. was acclimating to his new life. But, instead, by refusing to participate, Mother was unable to do any of these things. And because Mother refused to participate, Kent was left with the sources of information she did have available to her, including the perspectives of Father, one of S.E.'s adult siblings, and reports from S.E.'s school.

**{¶51}** Mother asserts that the decision to interview one of S.E.'s adult siblings was improper because the sibling practically served as a character witness for Father. The social worker, however, justified her decision to interview the sibling by explaining that she wanted further testimony from an individual familiar with S.E., as well as the parents' familial dynamic.

**{¶52}** Considering the evidence before the trial court, we cannot say that the court abused its discretion by refusing to strike Kent's custody-evaluation report. Therefore, Mother's second assignment of error is overruled.

### C. Swearing in of Witnesses

**{¶53}** In her third assignment of error, Mother argues the trial court erred when it allowed six witnesses to testify without being sworn-in. Mother insists that she timely objected and preserved the issue for appeal by raising the issue in her proffer.

**{¶54}** Critical to every trial is that witnesses must testify under oath. *Scott v. Wells*, 2022-Ohio-471, ¶ 13 (1st Dist.). Evid.R. 603 requires that "every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation" in a manner that binds upon the witness an obligation to remain truthful. However, the error is waived if not timely objected to. *In re G.W.*, 2020-Ohio-3355, ¶ 21 (1st Dist.). An objection is timely when the issue raised could have been avoided or corrected by the court. *State ex rel. Holwadel v. Hamilton Cty. Bd. of Elections*, 2015-Ohio-5306, ¶ 50. An objection raised for the first time in closing arguments is ultimately untimely. *Id.*

**{¶55}** The domestic relations court's oath-administration process complied with the relevant evidentiary rules and statutory authorities. R.C. 2317.30 only requires that an oath be administered prior to a witness testifying. Evid.R. 611(A) allows trial courts discretion in controlling the presentation of evidence, and they may take measures to avoid the needless consumption of time. Evid.R. 603 does not require that a pretestimonial oath be administered in a court room, or that the oath occurs on the record, or that the judge or magistrate be the one who administers the oath. *Weissenberger's Ohio Evidence Treatise*, § 603.2 (2024), similarly recognizes that an oath may be administered in a multitude of manners, such as by an officer of the court or in a remote location, so long as the one administering the oath is authorized to do so and the witness is cognizant of their obligation to provide truthful

testimony. "Generally, those ministerial duties of a judge may be delegated to the clerk by statute or by court order. Examples include the power to administer oaths." *State v. Dewitt,* 2014-Ohio-162, ¶ 6 (3d Dist.). Here, the court determined it could utilize a more efficient oath-administration process, and the court delegated the duty of oath administration to its staff attorney, and the oaths were administered to each witness in the court's case manager's office, just outside the courtroom. Therefore, the court's process was not improper.

**{¶56}** Even if the procedure utilized by the court was irregular, Mother's failure to timely object constituted a waiver of the issue. Mother only attempted to clarify whether oaths had been properly administered once during trial:

STAFF ATTORNEY: Next witness your honor, is [S.E.'s older sister]. She is under oath.

THE COURT: Okay. Come right on up here, ma'am, and just have a seat. Okay. Go ahead, Mr. Edelstein.

FATHER: Thank you.

MOTHER: Your Honor--

THE COURT: Well, sorry, let me --

MOTHER: -- is the oath not on the record, or –

THE COURT: she swears them when –

MOTHER: Okay.

THE COURT: --they're in the hallway Ms. Edelstein . . . .

Mother did not object to any of the other five witnesses sworn in by this process. Instead, Mother raised the matter in her posttrial proffer.

**{¶57}** The proper time to have raised this objection would have been prior to each witnesses' testimony. Mother's failure to timely object ultimately constituted a

20

waiver of deficiencies in the court's oath-administration process, and therefore Mother's third assignment of error is overruled.

### D. Venue

**{¶58}** In her fourth assignment of error, Mother challenges the trial court's determination that venue was proper, alleging that Father did not satisfy the statutory residency requirements.

**{¶59}** A trial court is in the best position to ascertain whether a change in venue is necessary, and thus determinations of proper venue shall not be disturbed absent an abuse of discretion. *State v. Thompson*, 2014-Ohio-4751, ¶ 91. R.C. 3105.03 provides that in divorce proceedings, a plaintiff must be a state resident for six months and that the action shall be brought in the proper county pursuant to the Rules of Civil Procedure. This court applies this statute strictly. *Griffin v. Griffin*, 2019-Ohio-5260, ¶ 12 (1st Dist.).

**{¶60}** There are two relevant venue provisions under Civ.R. (3)(C):

(6) The county in which all or part of plaintiff's claim arose;

[and]

(9) In a divorce proceeding, the county that plaintiff was a resident in

for ninety days prior to filing.

This court considers the venue provisions of Civ.R. (3)(C) as disjunctive, and therefore, proper venue in a divorce proceeding is not strictly limited to subsection (C)(9). *Wise v. Wise*, 8 Ohio App.3d 243, 244 (1st Dist. 1983).

**{¶61}** In accordance with *Wise*, the trial court did not err in finding proper venue. The parties had lived and raised their family in Hamilton County for years. When the parties' relationship dissolved and the two separated, Father moved out, while Mother continued to live in the marital home, which was in Hamilton County.

Upon leaving, Father left nearly all the marital possessions within the home. Prior to his divorce filing, Father secured a DVCPO against Mother in Hamilton County. Because all material facts giving rise to Father's divorce complaint arose in Hamilton County, venue was proper pursuant to Civ.R. (3)(C)(6).

**{¶62}** Therefore, the court did not err in finding Hamilton County was the proper venue, and therefore we overrule Mother's fourth assignment of error.

### E. Judicial Notice

**{¶63}** In her fifth assignment of error, Mother argues that the trial court committed reversible error by taking judicial notice of the amount of backpay she was awarded in her federal jury trial. In the alternative, Mother argues that the court's inclusion of her jury award as part of the marital estate was inequitable and therefore a basis for reversal.

**{¶64}** Evid.R. 201(B) provides that a court may take judicial notice of facts not subject to reasonable dispute, such that they are generally known or are readily capable of being determined by sources whose accuracy cannot be questioned. Public records and government documents are generally considered not subject to reasonable dispute. *State ex rel. Banker's Choice, LLC v. City of Cincinnati*, 2020-Ohio-6864, ¶ 8 (1st Dist.). While a court may take judicial notice of a public record, it may not take notice of disputed facts within those public records. *Morelia Group-De, LLC v. Weidman*, 2023-Ohio-386, ¶ 21 (1st Dist.); *see DiVenczeno v. DiVencenzo*, 2022-Ohio-4457, ¶ 1 (11th Dist.) (holding that a court may not take judicial notice of the facts underlying another court's judgment entry).

**{¶65}** Compensation for the loss of marital earnings is considered marital property. R.C. 3105.171 (A)(6)(a)(vi); *see Mayer v. Mayer*, 2011-Ohio-1884, ¶ 10 (5th Dist.) (finding a monetary award without evidence that the award was for lost earnings

22

or to compensate for marital expenses is presumed to be separate property).

{¶66} The court did not err in taking judicial notice of Mother's jury award. Despite Mother's assertion, the court took notice of the journalized verdict form, a document not subject to reasonable dispute, that states that Mother was awarded backpay totaling $835,000. Given that the lawsuit was filed in 2017, the jury's backpay award would have compensated Mother for wages she would have been entitled to while still married to Father. Therefore, the award was properly considered a marital asset.

{¶67} Mother's argument that the inclusion of the backpay award was inequitable also fails. The backpay award compensated Mother for lost earnings, earnings which would have otherwise accrued while Mother and Father were married. The timeliness of the jury's verdict occurring after the parties had separated neither changes the fact the money was earned during the marriage nor limits Father's entitlement to a share of the award as part of the marital estate.

{¶68} However, it appears that Mother's backpay award has since been altered. The Southern District of Ohio in *Edelstein v. Stephens*, 2024 U.S. Dist. LEXIS 35217, *16-17 (S.D. Ohio Feb. 29, 2024), reduced Mother's backpay award by $20,444.00. Since Mother is currently appealing the court's order, the award remains in dispute. Regardless, we conclude that Father is entitled to one-half of any backpay damages awarded to Mother.

{¶69} Accordingly, the court did not err in taking judicial notice, nor did the court act inequitably in considering Mother's backpay award as a marital asset. Therefore, we overrule Mother's fifth assignment of error.

### F. Division of Marital Assets

{¶70} In her sixth assignment of error, Mother challenges the court's division

23

of marital assets. Specifically, Mother argues the court abused its discretion in the division of the parties' interests in their vehicles, Mother's retirement funds, the parties' life-insurance policies, the parties' household goods, the division of debt, and the allocation of court costs.

{¶71} We review a trial court's division of marital property for an abuse of discretion. *Iranpour-Boroujeni v. Emami*, 2024-Ohio-2546, ¶ 82 (1st Dist.). Courts are required to classify what constitutes marital as opposed to separate property. R.C. 3105.171(B). Marital property constitutes real or personal property owned or acquired by either spouse during the marriage. R.C. 3105.171(A)(3)(a). In contrast, separate property includes property acquired prior to marriage, passive income during the time of marriage, property acquired after a decree of legal separation, or compensation for a spouse's personal injury. R.C. 3105.17(A)(4)(a)(i)-(vii). However, compensation for a loss of marital earnings does not constitute separate property. R.C. 3105.17(A)(4)(a)(vi). Once classified, the court must equitably divide marital property in accordance with the nonexhaustive factors contained within R.C. 3105.171(F).

{¶72} Turning to Mother's first issue with the court's distributive award, we hold the court did not err in classifying the cashed-in proceeds of Mother's retirement plan as a marital asset. Retirement benefits are considered marital property. R.C. 3105.171(A)(3)(a)(i)-(ii); *see Smith v. Smith*, 2015-Ohio-2258, ¶ 12 (1st Dist.). Further, the Supreme Court has long recognized that if a party could freely withdraw and squander marital assets in the time between separation and the entry of a final divorce decree, inequity would ensue, and the outcome would run counter to public policy and case law. *Berish v. Berish*, 69 Ohio St.2d 318, 320-321 (1982). Both Mother's and Father's retirement account are classified as marital property, thus the proceeds from Mother's retirement accounts were marital property subject to

equitable division. While Mother asserts that Father's retirement account should also be included in the distributive award, the court noted that the value of Father's retained interest in his retirement account was offset by his assumption of the outstanding debt on his vehicle, and was a result of forgoing his equity interest in Mother's vehicle. Therefore, the court did not err.

**{¶73}** Mother next insists the court erred when it did not divide the cash proceeds of Father's life-insurance policy or equally allocate credit-card debt. However, neither argument has merit. Life-insurance policies are marital assets when their premiums are paid for with marital assets. *Lanzillotta v. Lanzillotta*, 2013-Ohio-4050, ¶ 9 (1st Dist.). Similarly, debt accrued during marriage is subject to equitable division and is reviewed under an abuse-of-discretion basis. *Carter v. Carter*, 2024-Ohio-1046, ¶ 12-13 (1st Dist.). While proceeds from the insurance policy as well as the parties' marital debt could have been divided, the court determined that it would be equitable for each party to take their respective policies and debts free and clear of one another. Mother failed to demonstrate that the court abused its discretion, and therefore, the trial court did not err in not requiring Father to pay Mother proceeds from his life-insurance policy.

**{¶74}** Mother's objections to the court's division of personal property are also without merit. The court found that Mother failed to allow Father the opportunity to collect personal, familial, and religious items from the home before they were destroyed. The record demonstrated that Mother told Father that he would be able to retrieve his personal property from storage. But, instead of allowing Father access to the items, she had them destroyed without providing any notice to Father.

**{¶75}** Mother takes issue with the court's $5,000 contempt penalty for having Father's items destroyed. This penalty, however, constitutes an equitable offset, given

25

that Mother denied Father the opportunity to collect his equitable distribution of household goods and furnishings. This offset included all "remaining household goods, keepsakes, and furnishings," which would include the bottle of 1976 Glenrothes Single Malt Scotch. Thus, Mother's claim that the court failed to include the value of the bottle of scotch in the marital assets is without merit.

**{¶76}** Further, the court's comments that Mother acted "callously" in light of her "professed faith and reverence for religious traditions and rights" do not rise to arbitrary, unconscionable, or unreasonable behavior given Mother's own testimony on the importance that faith plays in her life and the contrast in destroying Father's religious memorabilia. Therefore, Mother's issues with the court's division of household property are not persuasive.

**{¶77}** We also find that the trial court's award of costs to Father was appropriate. We review the allocation of costs for an abuse of discretion. *Harris v. Vision Energy, LLC*, 2024-Ohio-2878, ¶ 31 (1st Dist.). Pursuant to Civ.R. 54(D), courts maintain the discretion to award costs to the prevailing party. *Id.* Because Father was the prevailing party, the court did not abuse its discretion in awarding him costs.

**{¶78}** However, the court did err in the division of the parties' vehicles. Mother asserts that the court erroneously concluded that Mother's vehicle was held solely in her name when the evidence shows that Mother's vehicle was jointly owned with Father. Further, Mother argues that because of that erroneous conclusion, the court erred by failing to order Father to facilitate the transfer of the title of Mother's vehicle into her name. Finally, she argues that because Father was ordered to assume the debt associated with his vehicle, the court erred in failing to order Father to refinance the loan into his name. Mother's challenges have merit.

**{¶79}** On the conveyance of title, the parties agreed that each individual's vehicle was jointly titled, yet the court found that Mother held sole title in her vehicle. This finding conflicts with the parties' testimony, as well as the court's order that Father shall forgo his equity interest in Mother's vehicle. On the assumption of the outstanding loan balance on Father's vehicle, the court's entry also conflicts, in that the court ordered each party to be responsible for liabilities in their respective names but also ordered Father to assume the outstanding loan debt for his vehicle. Given that Mother is the principal borrower on the loan for Father's vehicle, it is not abundantly clear from the court's entry what next steps the parties are to take. Mother argues that Father should be required to refinance the car loan into his name. But this is something for the trial court to determine on remand. Because the court erred in finding that Mother held sole title in her vehicle and because of the conflicting court orders, the court's determination as to the division of vehicles was not supported by competent, credible evidence, and therefore the court's determination constituted an abuse of discretion.

**{¶80}** Of the arguments raised challenging the court's division of marital property, only Mother's arguments on the conveyance of vehicles have merit. Therefore, Mother's sixth assignment of error is sustained in part and overruled in part. We reverse the court's judgment with respect to the parties' vehicles and remand the cause for the court to properly distribute those assets and any associated liabilities so as not to conflict with other aspects of the court's entry.

### G. Jurisdiction to Adopt a New Child-Support Order

**{¶81}** In her seventh assignment of error, Mother argues that by filing her notice of appeal, she divested the trial court of its jurisdiction to enter new judgments. And, even if the court had jurisdiction, Mother argues that the court's renewed child-

support obligation does not comport with the child-support order guidelines.

**{¶82}** Traditionally once a matter has been appealed, the trial court is "divested of jurisdiction over matters that are inconsistent with the reviewing court's jurisdiction to reverse, modify or affirm the judgment." *State ex rel. Allenbaugh v. Sezon*, 2023-Ohio-1754, ¶ 16. Determinations of child-support obligations are reviewed for an abuse of discretion. *Rummelhoff v. Rummelhoff*, 2022-Ohio-1224, ¶ 18 (1st Dist.).

**{¶83}** Mother's argument in support of this assignment of error fails because it does not consider the entire procedural record. On January 3, 2024, Mother filed a notice of appeal, which predated the court's final divorce decree, which was filed January 9, 2024. This court dismissed Mother's appeal, while denying her motion for a stay, citing that no final appealable order existed for her to appeal from. Again, on January 18, 2024, Mother filed a notice of appeal before the court could enter its final divorce decree. In our January 31, 2024 entry, this court remanded the matter to the trial court to enter its final divorce decree, which it did. Accordingly, the trial court was vested with jurisdiction when it entered its finding, and therefore, Mother's jurisdictional arguments are without merit.

**{¶84}** Beyond Mother's unpersuasive jurisdictional arguments, Mother has failed to demonstrate the court's January 2024 child-support order was erroneous. Mother has not identified anything in the record that demonstrates that the child-support entry contained a miscalculation, but instead generally alludes that the entry was erroneous and contradicts the Child Support Enforcement Agency's guidelines. "It is not this court's duty to 'root out' arguments supporting a party's position on appeal." *Ayer v. Morenz-Harbinger*, 2020-Ohio-6861, ¶ 26 (1st Dist.). Because Mother has not cited to any error in the record as to the calculation of her child-

support obligation, her argument is without merit. This determination does not preclude Mother from moving the domestic relations court to modify her child-support obligation.

**{¶85}** Accordingly, we overrule Mother's seventh assignment of error.

### H. Findings of Contempt

**{¶86}** In her eighth assignment of error, Mother challenges the trial court's findings of contempt, asserting that the court adopted a discriminatory visitation order. Mother asserts three defenses to the court's contempt findings, arguing that it was impossible to comply with the court's order, that she did not comply out of concern for S.E.'s welfare, and that at most her violations of the order were technicalities.

**{¶87}** Findings of contempt are reviewed for an abuse of discretion. *Dexter v. Fairfield*, 2024-Ohio-6080, ¶ 31 (1st Dist.). In civil proceedings, a contempt finding is meant to "coerce compliance with a court order or to compensate a party damaged by noncompliance with a court order." *Heekin v. Silver Rule Masonry, Inc.*, 2011-Ohio-2775, ¶ 13 (1st Dist.). A single technical violation of a court's visitation order does not mandate a contempt finding. *Quint v. Lomakoski*, 2007-Ohio-4722, ¶ 25 (2d Dist.).

**{¶88}** Courts have recognized several affirmative defenses to the charge of contempt. Generally, the burden lies with the party asserting an inability to comply with the order to prove such inability by a preponderance of the evidence. *Cornell v. Shain*, 2021-Ohio-2094, ¶ 42 (1st Dist.). To raise an effective impossibility defense, the contemptuous party "must take all reasonable steps within her power to comply with the court's order and . . . must show categorically and in detail why she is unable to comply with the court's order." *Kennard v. Smith*, 2024-Ohio-1683, ¶ 19 (5th Dist.), quoting *Lahoud v Tri-Monex, Inc.*, 2011-Ohio-4120, ¶ 54 (8th Dist.).

**{¶89}** Additionally, we have recognized a good-faith defense to contempt where noncompliance was necessary to protect the safety of a child. *In re E.J.M.*, 2024-Ohio-3082, ¶ 21 (1st Dist.). Courts applying this exception require that the contemnor's noncompliance be rooted in a good-faith reasonable belief that compliance with the court's visitation order would jeopardize the child's safety. *See id.* (holding that a child coming home from visitation with bruises, scratches, and exhibiting unusual distressed behavior was a sufficient basis to withhold parental-visitation time); *Brennan v. Brennan*, 2021-Ohio-1865, ¶ 41-43 (5th Dist.) (holding a child's anxiety and stress associated with visiting another parent, absent evidence of mistreatment or abuse, was insufficient to justify noncompliance); *McLead v. McLead*, 2007-Ohio-4624, ¶ 33-34 (4th Dist.) (holding a good-faith belief that a child was sexually abused justified noncompliance); *Buchanan v. Buchanan*, 1999 Ohio App. LEXIS 3780, *4-5 (12th Dist. Aug. 16, 1999) (holding parent not to be in contempt of a visitation order where child was bruised and stated, "Mommy hit me in the teeth.").

**{¶90}** However, Mother has failed to successfully demonstrate any defense to contempt. As to Mother's impossibility defense, Mother has failed to request any accommodation for her religious restrictions, her physical disability, or to alleviate the financial hardship of traveling to and from Indianapolis. It was not until trial that Mother provided an alternative visitation plan. Therefore, the record fails to demonstrate that Mother took all reasonable steps to comply with the court's visitation order.

**{¶91}** Similarly, Mother's good-faith defense also fails. Mother testified that Father exposed S.E. to a multitude of harms, such as viewing sexual content in a video game, being left alone at home, being left alone with non-English speakers, being

around Father and others while they were under the influence, and having his phone taken away. However, the present allegations are readily distinguishable from the severe harms, like physical and sexual abuse, that traditionally justify the good-faith defense.

**{¶92}** Mother's argument that her noncompliance was a mere technicality is also not persuasive. In support of the technicality defense, Mother cites to *Quint*, a case in which the Second Appellate District held that a loss of 45 minutes of visitation time constituted a mere technical violation, and the trial court's related finding of contempt on such a technicality was an abuse of discretion. *Quint*, 2007-Ohio-4722, at ¶ 24-25 (2d Dist.). However, the circumstances in *Quint* are not comparable to the facts in this case, given that Mother's noncompliance with the visitation order resulted in Father missing not 45 minutes, but eight weekends of visitation time. While the spirit of the technicality rule is not to punish a parent over the loss of minutes of visitation, Mother's conduct caused Father to go months without seeing his son and cannot be reasonably viewed as a technical violation of the court's visitation order.

**{¶93}** For the reasons cited above, the trial court's rejection of Mother's impossibility, good-faith, and technicality defenses was not unreasonable, arbitrary, or unconscionable. Accordingly, Mother's eighth assignment of error is overruled.

### I. Suspended Contact and Record Access

**{¶94}** In her ninth and final assignment of error, Mother asserts that the court did not act in furtherance of S.E.'s best interest when it suspended Mother's contact with S.E. and restricted her access to S.E.'s records, and that the court erred when it did not appoint a new GAL.

**{¶95}** We review a court's parental-visitation determination for an abuse of discretion. *Bohannon v. Lewis*, 2022-Ohio-2398, ¶ 27 (1st Dist.). The trial court has

broad discretion in establishing and modifying parental visitation rights. *Id.* The court below reviewed the factors of R.C. 3109.04(F)(1) and found that it was in S.E.'s best interest for Mother's visitation rights to be suspended to allow for S.E. to reunify with Father. "But, when one parent is the legal custodian, modifications to visitation or parenting time are not governed by [R.C. 3109.04] and instead such modifications are subject to R.C. 3109.051." *Tyra v. Griffith*, 2025-Ohio-912, ¶ 42 (1st Dist.), quoting *Bohannon* at ¶ 28. Regardless, since the factors of the respective sections are quite similar, reliance on the incorrect section amounts to a harmless error so long as there is some demonstration that the trial considered the relevant factors. *Id.*

{¶96} Similarly, a court's decision restricting a parent's access to her child's records is reviewed for an abuse of discretion. *Cagle v. Cagle*, 2022-Ohio-671, ¶ 8 (1st Dist.). R.C. 3109.051(H)(1) provides that a nonresident parent is entitled to access her child's records unless the court determines it is not in the best interest of the child. Best-interest determinations are guided by several factors, including those specified in R.C. 3109.04(F). *Id.* at ¶ 8. Where a court decides to restrict a nonresident parent's access to records, the court must enter written findings and issue an order containing the conditions of access to both the residential and nonresidential parent. R.C. 3109.051(H)(1).

{¶97} Juv.R. 4(B) governs the court's appointment of a GAL in a case. Where one of the Juv.R. 4(B)(1)-(9) factors applies, the court shall appoint a GAL to protect the interest of the child. One such instance includes when a child's and parent's interests conflict. Juv.R. 4(B)(2). While this court has not adopted a standard of review for a court's decision not to appoint a GAL, other appellate courts have reviewed these determinations for an abuse of discretion. *See Woods v. Best*, 2025-Ohio-357, ¶ 36 (4th Dist.), quoting *In re Slider*, 2005-Ohio-1457, ¶ 9 (4th Dist.) ("the

relevant question here is whether the record below 'reveals a strong enough possibility of conflict of interest between the legal guardian and child to show that the juvenile court abused its discretion' by not appointing a guardian ad litem"); *In re K.M.*, 2024-Ohio-1395, ¶ 16 (5th Dist.); *In re D.P.*, 2023-Ohio-3120, ¶ 33, (11th Dist.); *In re Sappington*, 123 Ohio App.3d 448, 453 (2d Dist. 1997).

**{¶98}** Turning to Mother's arguments, the court did not err in finding that no contact was in S.E.'s best interest. The court did commit a harmless error when it considered R.C. 3109.04(F)(1) instead of the R.C. 3109.051 factors. Despite this error, however, the court's decision to suspend Mother's visitation to allow for S.E. to reunify with Father was a determination that was supported by the best-interest factors. Because the court's findings that Mother attempted to sever S.E.'s relationship with Father was clearly supported by the record, the court did not err in suspending Mother's visitation with S.E.

**{¶99}** However, the trial court erred when it failed to hold a status-report conference on Mother's visitation rights. Our January 31, 2024 entry remanding the matter to the trial court to resolve all pending motions vested the court with jurisdiction to hold a hearing, however, no such hearing was held. Thus, the court erred, and the appropriate remedy is for the court to hold a Civ.R. 75(N)(2) hearing on remand.

**{¶100}** Similarly, the court's restriction of Mother's access to S.E.'s records was not an abuse of discretion. The court's entry considered the best-interest factors and expressly found that Mother's persistent behavior of alienating S.E. posed a risk to the child's emotional safety and mental stability. Because the evidentiary record supports the court's entry, we cannot say that the court abused its discretion.

**{¶101}** The court also did not err in not appointing a GAL. Mother's cited

authority, R.C. 2151.281(D), dictates that the court shall discharge and replace a GAL that fails to fulfill his or her duties. However, the GAL in this case voluntarily withdrew, and the court found that the GAL withdrew "due to no fault of her own." Therefore, the court did not discharge the GAL for her failure to perform and thus was not obligated to reappoint another. Further, the court advised the parties in its June 28 entry that it did not believe that S.E. needed a GAL, but if either party believed S.E. needed a GAL, they could move for the court to appoint one—neither party did so. Thus, the court did not abuse its discretion.

{¶102} Accordingly, we overrule Mother's ninth assignment of error in part and sustain it in part, and we remand the cause to the trial court to hold a Civ.R. 75(N)(2) hearing.

### III.    Conclusion

{¶103} We overrule Mother's first, second, third, fourth, fifth, seventh, and eighth assignments of error, and overrule in part and sustain in part Mother's sixth and ninth assignments of error. We reverse the trial court's judgment with respect to its division of the parties' vehicles and associated liabilities and remand the cause to the trial court for further proceedings consistent with this opinion and the law. We also direct the trial court to hold a Civ.R. 75(N)(2) hearing to address Mother's request for visitation. We affirm the trial court's judgment in all other respects.

Judgment accordingly.

CROUSE, P.J., and NESTOR, J., concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.