[Cite as *In re T.C.*, 2026-Ohio-240.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: T.C.

:

:

:

:

APPEAL NO.   C-250010
TRIAL NO.    F/23/730 X

*JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 1/28/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *In re T.C.*, 2026-Ohio-240.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: T.C.                 :         APPEAL NO.    C-250010
                                         TRIAL NO.     F/23/730 X

                                   :

                                   :              *O P I N I O N*

                                   :


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: January 28, 2026


Appellant Father, pro se,

Appellee Mother, pro se.

**BOCK, Presiding Judge.**

{¶1} Appellant Father appeals the juvenile court's judgment granting him limited supervised visitation with his son, T.C. Father raises three assignments of error challenging some of the juvenile court's factual determinations contained in its best-interest analysis. Because the juvenile court's factual findings were supported by competent credible evidence, and because Father fails to raise a challenge to the juvenile court's ultimate best-interest determination, we affirm.

## I. Factual and Procedural History

### A. Procedural history

{¶2} In May 2023, Father filed a motion for custody of his and appellee Mother's two-year-old son, T.C. In addition, Father filed a complaint for visitation.

{¶3} In December 2023, Father established paternity of T.C. A magistrate held a hearing on Father's motions over three days in March, April, and May 2024. Both Father and Mother elected to represent themselves at the hearings. At the beginning of the March-2024 hearing, Father withdrew his motion for custody and proceeded solely on his motion for visitation. At the hearings, Mother explained that she supported Father having visitation but wanted the visits to be supervised.

{¶4} In July 2024, the magistrate issued her decision, which granted Father visitation with T.C. In the first month, Father and T.C. would have twice-weekly four-hour supervised visits. During the second month, Father would have unsupervised visits from Friday evening to Sunday evening every other weekend. And beginning in the third month, Father's visitation would be according to the "Parenting Time Schedule," which provided the parents equal time with T.C.

{¶5} Mother objected to the magistrate's decision, arguing that she had failed to consider Mother's protection order in place against Father. Mother further argued

that she had not agreed that supervised visitation was appropriate and took issue with the magistrate not requiring Father to take parenting or anger-management courses.

**{¶6}** The juvenile court sustained Mother's objection. It granted Father parenting time but altered the magistrate's specific schedule. First, for two weeks beginning in December 2024, Father and T.C. would have daily video calls for up to 30 minutes. Then, Father would have supervised visitation every Saturday for four hours and every other Wednesday for two hours. The juvenile court stated that it would not entertain any change in the visitation schedule until January 2025, after which either party could move to modify the schedule.

**{¶7}** Father appealed.

**B. Facts**

**{¶8}** Over the course of three days, the magistrate heard testimony from Father, Mother, Mother's sister, Mother's cousin, and Maternal Grandmother. As the juvenile court and magistrate recognized, much of the testimony and examination focused on past issues between Father and Mother rather than T.C.'s best interest.

**Father and Mother's prior relationship**

**{¶9}** Mother and Father met in 2012 when they worked together. They were friends but were not romantically involved.

**{¶10}** In 2013, Father's first son was born. Father had sole custody of this child, who was 11 years old at the time of the hearing.

**{¶11}** When Mother and Father met, Mother lived with her brother but later moved out. She moved into a homeless shelter that Father had recommended. After Mother lost her job, Father, then a truck driver, helped Mother learn to drive a truck. Mother, Father, and Father's son often drove together, spending nights in various hotels. Mother occasionally babysat Father's older son when Father was working.

4

## Mother and Father decided to have a child

{¶12} After falling out of contact for two years, Mother and Father reconnected and decided to have a child together. Mother, Father, and Father's older son moved into an apartment. Mother described an incident where Father's older son found and ate a container of gummy candies. While Mother testified that they were THC gummies, Father insisted they were CBD gummies.

{¶13} Mother testified that after T.C. was born in 2021, Father was "not being excessively active . . . in the beginning." She explained that Father would not take direction from her about things like how to properly bottle feed the baby. Mother believed T.C. disliked Father because T.C. cried when Father held him and stopped when Mother stepped in. Father complained to Mother that she prevented him from seeing the baby because she often left the apartment with T.C.

## Mother left with T.C.

{¶14} When T.C. was around three-to-four months old, Mother moved out of the apartment, taking T.C. with her. Mother testified that she kept T.C. from Father for reasons such as the gummy incident, which Mother believed showed that Father lacked protective capacity. Mother also believed that Father was a "nonactive parent."

{¶15} Although Father tried to contact Mother to see T.C., he could not reach her and did not see T.C. from December 2021 through July 2022. Mother believed that it was important for T.C. to have a relationship with Father, but she did not believe that the lack of time T.C. had with Father had any effect on T.C.

{¶16} Mother believed Father needed to take parenting classes because "there's things that [Father] should be learning with -- with for example, with making sure that the baby lays on their back and not on their stomach." Mother explained that when T.C. was around a month old, Father placed T.C. on his stomach. Mother

acknowledged that at the time of trial, T.C. was two years old and "safe sleep" rules for infants no longer applied to him.

### Father's attempts to contact T.C.

**{¶17}** During the time Mother did not allow Father to see T.C., Mother arranged a visit between T.C. and Paternal Grandmother at a park. Father was not invited, but he arrived with Paternal Grandmother. Father and Mother argued until Mother asked Maternal Grandmother to call the police. Park rangers arrived and spoke with Father.

**{¶18}** In July 2022, Father learned that Mother had an appointment with T.C. at a Women, Infants, and Children ("WIC") office. Father appeared at the WIC office and waited for Mother to arrive. Father testified that he hired a person to tell Mother that one of her car tires was flat so that Mother would remain in the area and Father could speak with her. Mother testified that Father flattened her tire; Father did not concede that he did so.

**{¶19}** Father admitted that when Mother was in the WIC office, he placed a GPS "tracker" on Mother's car. He explained that he did this to learn Mother's address because he had been unable to serve her with court filings. Father recorded himself placing the tracker on Mother's car and approaching Mother in the parking lot.

**{¶20}** Mother called her cousin to ask her to come to the WIC office because Father was there. Mother's cousin, who had never met Father, described Father's demeanor as "scary."

**{¶21}** Mother had her tire repaired at a shop across the street from the WIC office. Father followed Mother to the repair shop and continued to try to talk to her about T.C. Mother's cousin found Mother "inside the office of the tire place, basically hiding from [Father]." Mother and Father eventually agreed to meet at a park that

same day and Father spent time with T.C.

{¶22} A few weeks later, Mother found the tracker underneath her car. Mother then filed for, and was granted, a civil protection order ("CPO") against Father based on him having placed the tracker on her car.

### Father's home, employment, and parenting

{¶23} At the time of trial, Father had a three-bedroom home that he shared with his older son. Father's employer fired him after the court granted the CPO against him. He was in school to obtain a diesel-mechanic certification; he testified that he needed to pass a test to complete the certification. Father's older son was on the honor roll at his school and was engaged in sports, music, and theater.

{¶24} Mother described Father as often being disrespectful, which would make it difficult to coordinate visits. She testified that "me and [Father] has been tussling through the pregnancy, after the pregnancy, and it's not safe." Mother, who had completed several parenting courses, wanted Father to take parenting classes. She cited to the one instance where Father placed one-month-old T.C. on his stomach in his bed. Mother also wanted Father to take anger-management courses, explaining that she had called the police based on Father's actions. Mother alleged that Father had been convicted of domestic violence, but there is no evidence of that conviction in the record.

## II. Analysis

{¶25} On appeal, Father raises three assignments of error. First, Father challenges the juvenile court's reliance on Mother's and Mother's cousin's testimony involving the WIC office encounter. Father argues their testimony was not credible based on his video evidence. Second, Father challenges the juvenile court's statement that Father did not file for custody until 2023. Third, Father argues that the juvenile

7

court's findings regarding the "gummy incident" misinterpreted the evidence at trial and gave the incident undue weight compared to his "positive pieces of evidence" involving Father's raising his older son.

## A. Standard of review and statutory factors

**{¶26}** The juvenile court is afforded broad discretion in determining parental-visitation rights and this court will not reverse absent an abuse of discretion. *Edelstein v. Edelstein*, 2025-Ohio-1514, ¶ 95 (1st Dist.). The juvenile court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A trial court's factual determinations will not be disturbed on appeal if they are supported by competent and credible evidence. *State v. Hahaj*, 2025-Ohio-52, ¶ 13 (1st Dist.); *see Nungester v. Nungester*, 2018-Ohio-1113, ¶ 11 (3d Dist.).

**{¶27}** When a child is born to unmarried parents, after paternity is established, the father may file a complaint for reasonable parenting-time rights. R.C. 3109.12(A). Juvenile courts determining whether to grant parenting time, establish a parenting schedule, and resolve other parenting-time issues must consider all relevant factors, including the factors in R.C. 3109.051(D). R.C. 3109.051(C).

**{¶28}** The juvenile court was tasked with using its factual findings to analyze the relevant statutory factors and determine what was in T.C.'s best interest. Father's assignments of error, however, challenge only the juvenile court's factual findings, rather than its legal conclusions. In the interest of ensuring the parties understand the outcome in this case, we review the juvenile court's analysis of relevant statutory best-interest factors and address Father's challenges to the factual findings where relevant.

### The child's relationships

**{¶29}** Under R.C. 3109.051(D)(1), courts consider the "prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity. . ."

**{¶30}** The juvenile court found that T.C. had lived with Mother since his birth, Mother had kept T.C. safe and adequately provided for him, and T.C. had a relationship with Mother's extended family. As to Father, the juvenile court noted that his relationship with T.C. "is limited" due to the extended periods of time where Father was not permitted to see T.C. The court also observed that T.C.'s connection with Father's extended family "seems to be not as strong." It noted that although Mother had attempted to facilitate contact between T.C. and Paternal Grandmother, Father arrived at the meeting uninvited. Finally, the juvenile court found that T.C.'s relationship with Father's older son "is hindered by the limited contact."

**{¶31}** Father does not challenge these factual findings, and the findings are supported by evidence in the record.

### The location of the parents' residences

**{¶32}** R.C. 3109.051(D)(2) looks at the "geographical location of the residence of each parent and the distance between those residences."

**{¶33}** The juvenile court found that the parents' locations were not an issue because they lived within a 15-minute drive from each other. Father does not challenge the juvenile court's finding under this factor and the record supports it.

### The parents' available time

**{¶34}** R.C. 3109.051(D)(3) considers the "child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule."

{¶35} The juvenile court found that Father was completing a diesel-mechanics program and needed to obtain a final certification, and that Mother homeschooled T.C. and there were no issues with that arrangement. Father does not challenge this finding and the record supports it.

### The age of the child

{¶36} T.C. was three years old at the time of the juvenile court's decision. *See* R.C. 3109.051(D)(4).

### The child's adjustment to home, school, and community

{¶37} Under R.C. 3109.051(D)(5), the juvenile court found that T.C. was well adjusted to Mother's home and community, and was not adjusted to Father's home or community due to the limited time Father had spent with T.C. Father does not contest these findings and they are supported by the record.

### Time with siblings

{¶38} R.C. 3109.051(D)(8) requires the juvenile court to consider the amount of time a child can spend with siblings.

{¶39} The juvenile court noted that Mother has no other children, and Father has his older son with whom he wants T.C. to share a close relationship. Father does not challenge this finding on appeal, and it is supported by the record.

### Mental and physical health of parents

{¶40} Under R.C. 3109.051(D)(9), the juvenile court found that neither Mother nor Father had any reported health concerns. Father does not challenge this finding and the record supports it.

### Parent's willingness to reschedule and facilitate parenting time (First assignment of error)

{¶41} R.C. 3109.0951(D)(10) requires juvenile courts to consider "[e]ach

parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation."

{¶42} The juvenile court acknowledged that Father wanted to establish a parenting-time schedule and Mother repeatedly testified that T.C. "needs his Father." But the juvenile court, citing Father's testimony that Mother had kept T.C. from him, expressed its "concern[] as to whether the parents will be able to work together and facilitate each other's parenting rights."

{¶43} The juvenile court, however, determined that Mother "is open to creating a parenting time schedule for Father but has conditions that she would like met to ensure the Child's safety." It stated that it would "be remiss if it did not consider the nature of the parent's relationship, particularly Father's interactions towards Mother." It believed Father's examination of Mother at the hearing was an attempt to relitigate their personal conflicts rather than to focus on T.C.'s best interest. The juvenile court expressed concern about Father's placing a tracker on Mother's car and his demeanor when he confronted her at the WIC office, citing Mother's cousin's testimony that Father was "scary." While the juvenile court acknowledged that "a Child's relationship with his Father is important," it explained that Father's actions "cause the Court to be concerned about Father's ability to safely co-parent with Mother."

{¶44} Father's first assignment of error asserts that the juvenile court erred in finding that his actions were "inappropriate and scary." He asserts that his evidence, including his recording of the interaction, demonstrates that he did not yell, prevent Mother from leaving, or attempt to "snatch" T.C. from Mother's car. Father further

argues that Mother's cousin's testimony that he was "scary" was not credible in light of his video evidence.

{¶45} Father testified that after he learned Mother and T.C. had a WIC appointment, he waited in the parking lot and, to prevent Mother from leaving so he could see T.C., paid a man to tell Mother that her tire was flat. Father then placed a tracker on Mother's car, which he used to learn Mother's home address. These facts led to a court issuing a CPO to Mother against Father.

{¶46} Father's video reveals that during this interaction, he did not act in an overtly threatening manner and did not yell or scream at Mother. But he arrived unannounced to the WIC appointment, approached Mother when she was carrying T.C., stood in front of her closed car door, and repeatedly asked to see T.C. Mother's cousin explained that she did not know Father and found him "scary." It is reasonable for a stranger to find those actions "scary." The juvenile court's reliance on Mother's cousin's testimony was not erroneous.

{¶47} While Father's actions were motivated by his desire to see his son, even Father conceded that the means he used to contact Mother were inappropriate. The circumstances of the interaction support the juvenile court's determination that Father has a history of inappropriate conduct directed towards Mother.

{¶48} Father's first assignment of error, challenging the notion that his actions were "inappropriate and scary," has no merit and we overrule it.

### **Health and safety of the child (Third assignment of error)**

{¶49} In considering T.C.'s health and safety under R.C. 3109.051(D)(7), the juvenile court found no evidence suggesting that Mother could not provide for T.C.'s health and safety. While it acknowledged Father's testimony that his home was safe and appropriate, it cited the "gummy incident," observing that, regardless of whether

the gummies contained THC or CBD, it was undisputed that they were left in a place where Father's son could access them. The juvenile court specifically stated that this event did not "occur recently" and could not be "taken as indicative of the current state of Father's home." The juvenile court's concern mainly involved Father's response to the incident because he "seemed to absolve himself of any accountability, and instead, blamed Mother," which demonstrated that he did not "consider the possibility of [T.C.] ingesting something dangerous seriously and that he may not take the necessary steps to keep the Child safe."

**{¶50}** Father's third assignment of error challenges the juvenile court's conclusion that Father did not take responsibility for this incident, arguing that his testimony instead simply pointed out that he and Mother shared the space and she bore some responsibility for the gummies being left where his son could get them. And Father argues that the juvenile court, in concluding that he might not be able to keep T.C. safe, placed undue weight on the "gummy incident" and failed to consider his evidence that he otherwise had successfully raised his older son.

**{¶51}** Father testified that his older son had excelled in school and extracurricular activities, such as sports, theater, and music. Beyond the "gummy incident," there was no evidence that Father had not provided a safe home for his older son, or that he could not do so for T.C.

**{¶52}** But ultimately, it appears that the juvenile court gave little weight to the gummy incident. It specifically acknowledged that the incident occurred long ago and could not be used to evaluate the current safety that Father's home would offer T.C. Rather than the gummy incident itself, the juvenile court's concern involved Father's attempt to minimize his responsibility for his son ingesting a potentially dangerous substance.

**{¶53}** Father's third assignment of error, which challenges the juvenile court's conclusion that Father did not take responsibility for the "gummy incident," is overruled because the juvenile court's R.C. 3109.051(D)(7)'s factual findings were supported by the record.

### Interference with parenting time (Second assignment of error)

**{¶54}** R.C. 3109.051(D)(13) asks whether "the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court."

**{¶55}** The juvenile court observed that Father accused Mother of preventing him from seeing T.C. for more than ten months. But it explained that Father had not filed for parenting time until May 2023 and that Mother had not interfered with any court-ordered parenting time.

**{¶56}** Father argues that the juvenile court erred in using "the factor that father didn't file for parental rights until 2023, as if the father was avoiding the child." He claims the juvenile court failed to acknowledge that he was "responsible for all the filings for these proceedings" and that Mother avoided court service.

**{¶57}** Until the order now on appeal was entered, no court order existed awarding Father parenting time. So, while Mother prevented Father from seeing T.C. for a substantial amount of time, the juvenile court findings were not erroneous.

### Any other factor (Second assignment of error, continued)

**{¶58}** R.C. 3109.051(D)(16) permits the juvenile court to consider "[a]ny other factor in the best interest of the child."

**{¶59}** Under this factor, the juvenile court cited Father's actions during Mother's WIC appointment, at the tire shop, at the park, and at the planned visit between Mother, T.C., and Paternal Grandmother, where Father appeared despite not

being invited. For the same reasons explained above, the juvenile court's factual findings involving Father's conduct toward Mother were supported by competent and credible evidence.

**{¶60}** The juvenile court further pointed to Father not filing for visitation until May 2023 and instead "opt[ing] to try and make contact with [T.C.] through inappropriate means." We acknowledge that Father's out-of-court attempts to contact Mother and T.C. do not render his contention that he wanted a relationship with T.C. disingenuous. And Mother does not deny that she intentionally kept T.C. from Father for reasons that were of little relevance to T.C.'s best interest at the time of the hearing.

**{¶61}** But regardless of how valid or invalid Mother's justifications for keeping T.C. from Father were, Father's means of attempting to see T.C. were inappropriate. Competent and credible evidence supports the juvenile court's belief that Father would struggle coparenting with Mother.

**{¶62}** We overrule Father's second assignment of error.

### **The juvenile court did not abuse its discretion**

**{¶63}** Ultimately, the juvenile court's visitation schedule was not an abuse of discretion. While the amount of visitation may be less than what is typically awarded, Father's behavior was inappropriate and supported the juvenile court's conclusion that Father would struggle to coparent with Mother. The trial court's schedule— starting visitation slowly to determine how visits went before graduating to unsupervised visitation—was reasonable.

**{¶64}** Father's factual challenges to the trial court's findings lack merit. The juvenile court's visitation order was not an abuse of discretion.

### *III. Conclusion*

**{¶65}** We overrule Father's assignments of error and affirm the juvenile

court's judgment.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.